ERIK MARAN,

      Plaintiff,

      v.

VICTORIA'S SECRET STORES, LLC;
SCRATCH EVENTS, LLC; ROBERT
SILVA; DJ SILVA, LLC; JOHN DOE
ENTITIES 1–20; JOHN DOES 11–20,

      Defendants.

Civ. No. 17-308 (KM) (MAH)

**OPINION**

### KEVIN MCNULTY, U.S.D.J.:

Plaintiff Erik Maran alleges that he was exposed to a loud noise from a disc jockey's (DJ's) loudspeaker at a Victoria's Secret sales event, and suffered hearing loss as a result. Maran brought this negligence action against several entities that were in various ways associated with the mishap. Now before the Court are motions for summary judgment filed by two pairs of defendants:

(a) Victoria's Secret Stores, LLC ("Victoria's Secret") and Scratch Events, LLC ("Scratch") (DE 86); and

(b) Robert Silva and DJ Silva, LLC (together referred to as "Silva" unless otherwise specified) (DE 87).

For the reasons that follow, the motions are **GRANTED** in part and **DENIED** in part. The net result is that Scratch is dismissed from the case entirely. The only remaining counts against Victoria's Secret are Count I (Negligence) and Count II (Premises Liability). The only remaining count against Silva in his personal capacity and DJ Silva, LLC is Count I (Negligence).

# I.   BACKGROUND

## A. The Incident

On the evening of December 7, 2014, Maran and his girlfriend, Regina Swartz, went to the Victoria's Secret store at the Short Hills Mall. (DE 87-5). Maran and Swartz were there to attend the Fashion Show Shopping Event, to which they had been invited by Victoria's Secret. (DE 87-5). Upon their arrival, the event had not yet formally begun. Maran recalled that there were only a few customers in the store. (DE 87-6 at 97:5–11).

Maran and Swartz entered the store on its right side and walked toward the center sales space. (DE 87-5). In this center space, along the merchandise aisles, there were large loudspeakers mounted on floor stands, so that each speaker box was approximately five to six feet above the floor. (DE 87-5). The speakers were placed immediately adjacent to the aisles. (DE 87-5). Maran later testified that he noticed the placement of the speakers, observing that whoever set them up had wisely left the aisle clear, so that patrons could circulate freely. He added that he noticed the placement of the speaker because, as an architect, he paid attention to details like that. (DE 87-6 at 117:15–118:8).

The event had not yet begun when Maran and Swartz arrived, and there was no sound or music emanating from any speaker. (DE 87-5). As Maran passed through the store, he walked in the aisle between a display table of merchandise and a speaker that was two or three feet away from him. (DE 87-5). As Maran passed, a speaker on his left side, which until that point had been silent, suddenly emitted a blast of sound. (DE 87-5). Maran testified that he immediately felt pain:

> I put my hands to my ears immediately, to cover them because they hurt, and moved away as quickly as I could. I noticed an immediate change in my ears, as if a switch had been turned off, I continued to cover my ears until I connected with Regina and we left the store.
>
> The speaker was not attended by anyone, and was silent before the sound blast. There was no advanced warning, test or sound check

2

> while we were present, which might have given me time to redirect
> my path away from the speaker. The volume was immediately
> turned down or off after the blast. I don't remember what kind of
> sound or /music it was, as it was brief and I became immediately
> focused on covering my ears for the rest of the time I was in the
> store.

(DE 87–5 at 2–3). Maran could not further elaborate on the nature or source of the sound. (DE 87-6 at 120:17–20). The blast lasted for approximately one second, and the speaker again fell silent. (DE 87-6 at 120:21–23). In all, Maran had been at the store for less than five minutes when the sound blast occurred (DE 87-6 at 98:3–5), and he left the store about a minute or two afterward, (DE 87-6 at 110:20–116:6).

Maran later testified that apart from the speaker that caused the offending blast, he does not remember other sound equipment at the store on the day of the incident. (DE 87-6 at 114:5–8). He did not then know who operated the speaker or controlled its volume. (DE 87-6 at 132:14–25). Maran has no particular recollection of a DJ, DJ booth, DJ equipment, or other sound equipment at the store. (DE 87-6 at 106:25–107:3; 114:13–15). In fact, it was only later that he and Swartz learned that Victoria's Secret had hired a DJ. (DE 87-6 at 115). Maran testified that he did not see any other customers react to the sound from the speaker or lodge any complaints about the sound. (DE 87-6 at 125:3–13).

## B. The Aftermath

Maran alleges that the sound blast injured and impaired the hearing in both of his ears:

> 1) I have hearing loss in my left ear, which has remained
> consistent based on all testing in subsequent visits since the event.
> Based on what Dr. Fieldman and others have told me, my hearing
> loss is in a particular range, a "notch," which is indicative of loss of
> hearing due to a blast.
>
> 2) I have Tinnitus 24/7 in my left ear.
>
> 3) I have high sensitivity in both my right and left ears, also known
> as Hyperacusis, as labeled in Dr. Fieldman's notes.

(DE 87–5 at 3).

The pain had not abated a month after the incident, and so on January 12, 2015 Maran began seeing Dr. Robert Fieldman, an otolaryngologist.[1] (DE 91 ¶ 112). Dr. Fieldman administered several unsuccessful treatments to Maran, including steroid shots and acupressure. (DE 91 ¶ 112). He also conducted hearing studies, a tympanum pressure study, and a head scan. (DE 91 ¶ 112). Dr. Fieldman concluded that Maran had suffered hearing loss in the left ear, and that there was no surgical option for addressing the hearing loss, the hyperacusis, or the tinnitus. (DE 91-2 at 42).

Dr. Fieldman determined that Maran has "a notch" in his hearing that is consistent with loss of hearing due to a blast.[2] (DE 91 ¶ 113). He also explained that "[m]ost people have hearing loss [that is] spread out over the range of sound[, but Maran has] it in one particular area and that's consistent with a blast." (DE 91 ¶ 113).

Dr. Fieldman's report concluded:

> In my opinion his sensorineural hearing loss and tinnitus in his left ear are permanent in nature and were proximately caused by the loud noise that he was exposed to from the speaker at the time of the incident. My diagnosis is traumatic noise induced sensorineural hearing loss and tinnitus to his left ear. His prognosis is permanent sensorineural hearing loss and tinnitus with continued ringing and hyperacusis.

(DE 91 ¶ 114; DE 91-2 at 42). Audiologist Natan Bauman also evaluated Maran and concluded that there exists a causal link between the incident at the store and Maran's hearing loss:

> In consideration of all of the above and presenting medical and audiological evidence, it is my professional opinion, that there are no basis [sic] to dismiss the linkage between the original incident of December 7th, 2014 and the latent onset of tinnitus. Therefore,

---

[1]     Otolaryngology is the study of diseases of the ear and throat.

[2]     From the context, the "notch" seems to refer to a particular range of frequencies in which Maran's hearing is impaired.

4

it is my professional opinion that the latent tinnitus resulted from the original December 7th, 2014 incident.

It is also my professional opinion that the hyperacusis that Mr. Maran suffers from, in the contralateral ear, is due to the same incident which occurred on December 7th, 2014

(DE 91 ¶ 115; DE 91-2 at 55).

### C. Scratch Events and Silva

Victoria's Secret engaged the services of Scratch Events, a promoter for events of this kind. (DE 30 & 44; DE 86 ¶ 17). Indeed, Victoria's Secret had hired Scratch to provide DJs for 350 of its stores, the December 7, 2014 event being a nationwide one. (DE 87 ¶ 16). Scratch asked Silva,[3] with whom it had a professional history, to acts as DJ for event at the Short Hills Mall store. (DE 30 & 44; DE 86 ¶ 17). The DJ on duty on December 7, 2014 was in fact Silva. (DE 30 & 44).

At the time of the event, Silva had been a professional DJ for over fifteen years. (DE 86 ¶ 18). In 2011 he had entered into a Talent Services Agreement with Scratch and had worked at prior events under the terms of that agreement. (DE 87-9 & 87-10). Silva testified that that when he performed at the Victoria's Secret store on December 7, 2014, he was doing so pursuant to his Talent Services Agreement with Scratch. (DE 87-8 at 41:9–15).

In all, Silva has performed at three events for Victoria's Secret, the last being the one on December 7, 2014. (DE 87-8 at 145:13–15). He has never received any complaints or reports about the volume of the music at any Victoria's Secret event. (DE 87-8 at 145:19–25). Silva has never experienced or been told that his DJ equipment generates a sound blast. (DE 87-8 at 146:13–17). Nor has he ever experienced other problems with his DJ equipment. (DE 87-8 at 82:24–83:3). At the time of the December 2014 event, each piece of Silva's DJ set had been newly purchased by him. (DE 87-8 at 83:15–84:21). He

---

[3]     Silva had created a business entity, DJ Silva, LLC, as a vehicle for his professional DJ activities.

had reviewed all the instruction manuals, and none of the equipment then required or had ever required repair or maintenance. (DE 87-8 at 81:19–82).

It was on December 2, 2014, that Scratch engaged Silva by email to perform at the December 7, 2014 Victoria's Secret event. (DE 87-11). On December 5, 2014, Silva received a second email from Scratch that provided talking points for the event and clarified certain requirements, including a specification of the equipment Silva was to bring to the event. (DE 87-12).

Upon arriving at the Victoria's Secret store, Silva sought out a store manager for instructions on equipment setup. (DE 87-8 at l05:14–106:10). A Victoria's Secret manager told Silva where to set up and directed him as to where and how to position his equipment. (DE 87-8 at l09:7–19 & DE 87-9). IT was the Victoria's Secret manager who ultimately decided where the speakers would be placed. (DE 87-8 at 113:19–24).

Silva testified that he does not have much recollection of the event at the Victoria's Secret store. (DE 87-8 at 7:20–24). He recalls a raffle and remembers making announcements throughout the event, but he was not aware of any unusual occurrence. (DE 87-8 at 8:8–22). Silva did not know that Maran was injured until the summer of 2017, when Jeremy Bernstein of Scratch notified him of this lawsuit. (DE 87-7).

### D. Procedural History

On December 15, 2016, Maran filed in New Jersey state court a lawsuit alleging negligence by various entities in the Victoria's Secret corporate family. (DE 1-1). Victoria's Secret removed the action on diversity grounds. (DE 1).

As details of the professional and corporate relationships among Defendants emerged, Maran on several occasions amended the complaint: first to consolidate and properly identify the single Victoria's Secret entity that owns and operates the Short Hills Mall store; [4] (DE 7) second, to name Silva—in his

---

[4]     The Victoria's Secret defendants originally included Secret Stores, Inc.; Victoria's Secret Stores Brand Management, Inc.; VSS Store Operations, LLC; L Brands, Inc.; and Limited Brands, Inc. (DE 1-1). Once Victoria's Secret Stores, LLC

personal capacity—as a defendant; (DE 30) and third, to add the corporate entity DJ Silva, LLC as a defendant (DE 44). Scratch and Victoria's Secret filed crossclaims (DE 16 & 21), which they later withdrew (DE 83).

The currently operative third amended complaint (unless otherwise specified, the "complaint") now names as defendants Victoria's Secret; Scratch; DJ Silva, LLC; Silva, in his personal capacity; John Doe Entities 1–10; and John Does 13–20. (DE 44). The complaint contains four counts: (1) common-law negligence; (2) premises liability; (3) principal and agent liability; and (4) negligent hiring. All defendants are alleged to be jointly and severally liable. (DE 44).

On May 24, 2019, summary judgment motions were filed by two pairs of defendants: Victoria's Secret and Scratch (DE 86), and Robert Silva and DJ Silva, LLC (DE 87). Maran has filed briefs in opposition. (DE 91, 92)[5] Each pair of defendants has filed a reply in support of its own motion. (DE 89 & 90).

## II.    DISCUSSION AND ANALYSIS

Because this matter involves a controversy between citizens of different states and the amount in controversy is alleged to exceed the sum of $75,000, this Court has jurisdiction pursuant to 28 U.S.C. § 1332. New Jersey substantive law will apply. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

---

emerged as the proper defendant, the others were dismissed by stipulation of the parties. (DE 16).

[5]      Earlier, each pair of defendants filed a cross-claim against the other for contribution and indemnity. (*See* DE 59, 65.) Those cross-claims, however, were voluntarily dismissed. (DE 83). Here, each pair of defendants has moved for summary judgment with respect to the *plaintiff's* claims, not the defunct cross-claims. Unusually, each pair of defendants has nevertheless filed a brief in opposition to the other's motion for summary judgment. (DE 99, 100). These submissions in effect purport to assert the plaintiff's rights against a codefendant, cite (now nonexistent) claims for indemnification, and so on. Although I have reviewed these briefs, they are of secondary importance at this stage. The Court is open to valid arguments, even from kibitzers. My analysis, however, is channeled by the summary judgment motions before me and the validity, or not, of the grounds cited in support of those motions.

## A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no

genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### B. Premises Liability (Count II)

Count II (Premises Liability), by its nature, applies to Victoria's Secret, the owner and operator of the store where the incident occurred. I discuss it first because it sets the context of the standard of care applicable to defendant Victoria's Secret under Count I (Negligence).

The existence and scope of a duty of care are legal issues to be determined by the court. *Kuehn v. Pub Zone*, 364 N.J. Super. 301, 310 (App. Div. 2003) (citing *Carvalho v. Toll Bros. & Developers*, 143 N.J. 565, 572 (N.J. 1996); *Kelly v. Gwinnett*, 96 N.J. 538, 552 (N.J. 1984)).

New Jersey's doctrine of premises liability has evolved from its common-law origins, under which a landowner owed a visitor a duty of care that entirely depended on the visitor's classification as a trespasser, licensee or social guest, or business invitee. *See Sussman v. Mermer*, 373 N.J. Super. 501, 504 (App. Div. 2004). A business invitee, such as a retail customer or hotel guest, was owed a "duty of reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered." *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 434 (N.J. 1993). That standard of care included a duty "to conduct a reasonable inspection to discover latent dangerous conditions." *Id.* (citations omitted).

New Jersey common law is moving toward "a broadening application of a general tort obligation to exercise reasonable care against foreseeable harm to others." *Butler v. Acme Markets, Inc.*, 89 N.J. 270, 277 (1982) (citations omitted). A crucial element of this inquiry is foreseeability, which refers to "the knowledge of the risk of injury to be apprehended." *Amentler v. 69 Main St., LLC*, No. 08-0351, 2011 WL 1362594 at *4 (D.N.J. Apr. 11, 2011) (quoting *Kuehn*, 364 N.J. Super at 310). A court's task is to "consider all the

surrounding circumstances to determine whether it is fair and just to impose upon the landowner a duty of reasonable care commensurate with the risk of harm." *Sussman*, 373 N.J. Super at 505 (citing *Brett v. Great Am. Recreation, Inc.*, 144 N.J. 479, 509 (1996)). "In assessing whether imposition of such a duty would be fair and just, courts weigh and balance the following four factors: (1) the relationship of the parties, (2) the nature of the attendant risk, (3) the opportunity and ability to exercise care, and (4) the public interest in the proposed solution." *Id.* at 505, 575 (citing *Hopkins*, 132 N.J. at 439).

New Jersey courts continue to cite the traditional common law, however, even as they move to a more general standard of due care under all the circumstances:

> "Generally, a proprietor's duty to his invitee is one of due care under all the circumstances." Ordinarily, an invitee seeking to hold a business proprietor liable in negligence "must prove, as an element of the cause of action, that the defendant had actual or constructive knowledge of the dangerous condition that caused the accident."

*Prioleau v. Ky. Fried Chicken, Inc.*, 223 N.J. 245, 257–58 (2015) (quoting *Nisivoccia v. Glass Gardens, Inc.*, 175 N.J. 559, 563 (2003); *Bozza v. Vornado, Inc.*, 42 N.J. 355, 359 (1964)) (citing *Rowe v. Mazel Thirty, LLC*, 209 N.J. 35, 44 (2012) (noting that landowner's duty of reasonable care to business invitee "encompasses the duty to conduct a reasonable inspection to discover latent dangerous conditions"); *see also Arroyo v. Durling Realty, LLC*, 433 N.J. Super. 238, 243 (App. Div. 2013) ("The absence of [actual or constructive] notice is fatal to plaintiff's claims of premises liability," and "[t]he mere existence of an alleged dangerous condition is not constructive notice of it."). While the status of the injured party no longer rigidly dictates a landowner's liability, the common law classifications remain helpful in determining the existence and scope of the duty of care. *Amentler*, 2011 WL 1362594 at *5 (citing *Clohesy v. Food Circus Supermarkets, Inc.*, 149 N.J. 496 (1997)).

Victoria's Secret invited customers to the premises. Maran and Swartz went to the Victoria's Secret store in response to an invitation to the "Victoria's

10

Secret Fashion Show Shopping Event," at which Victoria's Secret was offering for sale various special offers, which were "[v]alid only at event on Dec. 7, 2014." Specifically, in connection with that event, Victoria's Secret hired the DJ. There is evidence that store personnel instructed Silva where to place the speaker. That speaker, capable of emitting sound at a decibel level high enough to damage a person's hearing, was placed at ear level and oriented toward the area where customers were invited to walk. Neither set of defendants seriously contests that the store owed Maran a high duty of care, including a duty to discover latent dangerous conditions.

At common law, Maran would be classified as a business invitee, owed a high duty of care to guard against dangerous conditions and to inspect for latent dangers. In this context, however, the application of the four *Hopkins* factors gets us to the same place. The relationship of the parties is that Maran was invited onto the premises by Victoria's Secret for the store's business advantage. He had no familiarity with, or responsibility for, the premises or the equipment. The nature of the risk was serious, if somewhat unusual. The opportunity and ability to exercise care rested entirely on parties other than Maran, who could not be expected to involve himself in the store's safety arrangements. The public interest is clearly in favor of imposing liability, to encourage the highest level of care in establishments that serve the general public.

Maran thus argues that Victoria's Secret had notice of a dangerous condition on its premises that bore a risk of foreseeable harm. Whether it breached any such duty is of course a factual issue. With that background, I proceed to analyze the primary claim of negligence.

### C. Common-Law Negligence (Count I)

Under New Jersey law, the three elements essential for the existence of a cause of action in negligence are: "(1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) an injury to plaintiff proximately caused by defendant's breach." *Endre v. Arnold*, 300 N.J. Super. 136, 141 (App. Div. 1997). The burden of proving such negligence is ordinarily

on the plaintiff. *See Dawson v. Bunker Hill Plaza Assocs.*, 289 N.J. Super. 309, 322 (App. Div. 1996).

### 1. Duty and Breach

Defendant Victoria's Secret, as discussed in section II.B., *supra*, owed Maran a duty of care to maintain the store in a safe condition, to avoid creating a condition which would render the store unsafe, and to discover and eliminate any dangerous condition. *See Nisivoccia*, 175 N.J. at 563–64; *Hopkins*, 132 N.J. at 444. The remaining defendants, Scratch and Silva, owed a more general duty to act in a manner that did not create a foreseeable risk of harm to others. *See J.S. v. R.T.H.*, 155 N.J. 330, 337–38 (1998) (citations omitted) ("Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists. The [a]bility to foresee injury to a potential plaintiff is crucial in determining whether a duty should be imposed."); *Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc.*, 135 N.J. 182, 194–95 (1994) ("Subsumed in the concept of foreseeability are many of the concerns we acknowledge as relevant to the imposition of a duty: the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care.").

Maran's direct evidence of negligence by Victoria's Secret is that its personnel directed Silva to place the speaker at ear level, pointed toward where he would be standing.[6] There is evidence that the proximity of the speakers, once set up as directed, would have been apparent to the staff at the store. The store manager and staff therefore allegedly should have been aware that a large speaker was located very close to the ears of customers who would later be walking by.

The direct evidence of negligence as to Scratch is virtually non-existent. Scratch did not own, maintain, or control the store, nor was it present when

---

[6]     Maran does not seem to be asserting that any defendant failed to react appropriately *following* the sound blast, an instantaneous event that allegedly caused immediate damage.

Maran was injured. Scratch procured the DJ for the event, but both Scratch and Silva testified that Silva was never employed by Scratch. There is no evidence that the injurious sound blast stemmed from any action or omission by Scratch.

The direct evidence of negligence as to Silva is that he was the owner and operator of the sound equipment. He placed the speakers in proximity to where Maran and other members of the public would be standing (albeit at the direction of Victoria's Secret). He had direct responsibility for the operation of the equipment. At some point, the speaker emitted a loud blast, allegedly in excess of what would be normal or expected from a sound system playing music or announcements.

Defendants argue with some force, however, that discovery has not uncovered evidence of precisely how this mishap occurred, or which of them was responsible for it.

### 2. *Res Ipsa Loquitur*

On that score, Maran invokes the tort doctrine of *res ipsa loquitur*. The *res ipsa* doctrine grants a plaintiff an inference of negligence under circumstances where it is obvious that *some* negligence occurred, even if the manner of its occurrence cannot be determined definitively:

> In any case founded upon negligence, the proofs ultimately must establish that defendant breached a duty of reasonable care, which constituted a proximate cause of the plaintiff's injuries. *Res ipsa loquitur*, a Latin phrase meaning "the thing speaks for itself," is a rule that governs the availability and adequacy of evidence of negligence in special circumstances. The rule creates an allowable inference of the defendant's want of due care when the following conditions have been shown: (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality [causing the injury] was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect.
>
> The rule in effect creates a permissive presumption that a set of facts furnish reasonable grounds for the inference that if due care had been exercised by the person having control of the

instrumentality causing the injury, the mishap would not have
occurred. While the doctrine allows only an inference of negligence,
it can create a powerful influence in the minds of the jury, and, as
a practical matter, may very well shift the burden of persuasion.
Once *res ipsa loquitur* is established, the case should go to the jury
unless defendant's countervailing proof is so strong as to admit of
no reasonable doubt as to the absence of negligence. In a case in
which *res ipsa loquitur* applies, a directed verdict against the
plaintiff can occur only if the defendant produces evidence which
will destroy any reasonable inference of negligence, or so
completely contradict it that reasonable men could no longer
accept it.

*Brown v. Racquet Club of Bricktown*, 95 N.J. 280, 288–89 (1984) (quoting
*Bornstein v. Metro. Bottling Co.*, 26 N.J. 263, 269 (1958); *Ferdinand v. Agric. Ins.
Co. of Watertown, N.Y.*, 22 N.J. 482, 493 (1956); *Hansen*, 8 N.J. 133, 139–40
(1951); *Gould v. Winokur*, 98 N.J. Super. 554, 564 (Law Div.1968) W. Prosser,
*Law of Torts*, § 40 at 233 (4th ed. 1971)) (citing 2 F. Harper and F. James, *The
Law of Torts*, § 19.11 at 1099–1101 (1956)) (internal citations omitted).

It is a common feature of *res ipsa* cases that the injured plaintiff is the
party worst-situated to identify the negligent act that caused his or her injury.
The doctrine in effect shifts the burden to the party in possession of the
relevant facts. *See Wollerman v. Grand Union Stores Inc.*, 47 N.J. 426, 430
(1966) ("[I]t would be unjust to saddle the plaintiff with the burden of isolating
the precise failure[—t]he situation being peculiarly in the defendant's hands
. . . ."); *see also Jerista v. Murray*, 185 N.J. 175, 193 (2005) ("[A] plaintiff need
not exclude all other possible causes of an accident" to invoke the *res ipsa*
doctrine, provided that the circumstances establish "that it is more probable
than not that the defendant's negligence was a proximate cause of the
mishap.") (quoting *Brown*, 95 N.J. at 287).

Classically, the doctrine applies where, *e.g.*, a patient wakes up from
surgery to find that the wrong procedure has been performed, or a pedestrian
is injured by a load of bricks falling from a rooftop construction project.
Context, of course, is all. *Res ipsa* might apply to a plaintiff deafened by a noise

at a retail event, but not to a plaintiff who suffered the same hearing loss after detonating explosives without protective earmuffs.[7]

I discuss in order the three factors governing the applicability of *res ipsa loquitur*: (a) an occurrence that bespeaks negligence; (b) an instrumentality within the defendant's exclusive control; and (c) no indication that the injury was the result of the plaintiff's voluntary act or neglect.

### (a) Occurrence bespeaking negligence

When a patron enters a retail store with normal hearing and leaves having been subjected to an ear-injuring sound blast by a loudspeaker, it is a natural (though not inescapable) inference that negligence has occurred. A loudspeaker in a retail store during a sales event would not normally—*i.e.*, absent some negligence—abruptly emit sound that damages the hearing of a bystander.

Maran is unable to demonstrate precisely how the sound blast occurred or identify the particular party at fault. But it is "fairly probable" that (at least) one defendant was responsible for creating the sound blast or causing it to occur in proximity to Maran's ears. The injury may have flowed from one or more causes: speaker placement, defective equipment, or negligent operation of the equipment are obvious possibilities. For those actions, the potentially responsible parties are Victoria's Secret and Silva.

I do not find, however, that *res ipsa* is so broad as to cover defendant Scratch. Scratch provided some training and instruction to the DJs with whom it contracted, and it stated some requirements concerning the nature of the equipment they were required to bring to events. It is of course possible that Scratch could have played a role in the alleged injury, but its potential negligence is not so apparent as to "speak for itself." It is not at all clear that there must have been negligent hiring or training for this injury to have

---

7       *See generally* U.S. Dep't of Health & Human Services, National Institutes of Health, National Institute on Deafness and Other Communication Disorders (NIDCD), "Noise-Induced Hearing Loss," https://www.nidcd.nih.gov/health/noise-induced-hearing-loss (last visited Oct. 20, 2019).

occurred. It is therefore not appropriate to relieve the plaintiff of the burden of pleading and proving facts demonstrating actual negligence on the part of Scratch. For the reasons stated above, the plaintiff has not met that burden as to Scratch.

Maran was an attendee at a retail sales event. Maran's injury—hearing loss from a loudspeaker that was placed near members of the public and capable of producing sound at a dangerous level, in circumstances where such high volume is not to be expected—is one that ordinarily bespeaks negligence. *See Brown*, 95 N.J. at 288–89. As to defendants Victoria's Secret and Silva, Maran has satisfied this, the first element of the *res ipsa loquitur* doctrine.

### (b) Instrumentality within Defendants' control and
### (c) Maran's culpability

The second and third factors in the *res ipsa* test also weigh in favor the doctrine's application here.

As for factor (b), the instrumentality that caused Maran's injury—the loudspeaker and its associated electronics—was entirely within the control of defendants Victoria's Secret and Silva at all relevant times. (Again, it is not alleged that the sound system itself was ever in Scratch's custody or control.) No party seriously contests this.

Silva, of course, furnished and operated the equipment. Silva testified that a Victoria's Secret manager dictated both the placement of the speaker and the direction it should face. Silva testified that he purchases his equipment new—never second-hand—and always familiarizes himself with the instruction manuals. According to him, the equipment was in working order and had never required repair work. Thus there may be plenty of room for dispute among Defendants as to their relative responsibility for operation, maintenance, or placement of the equipment. There is no contention, however, that any of these equipment-related responsibilities belonged to others, or to Maran.

As for factor (c), plaintiff's culpability, the record does not suggest that Maran ever acted in some inappropriate or unexpected manner in relation to the loudspeaker. Several deponents testified that he simply passed by the

speaker in the aisle, an area where members of the public were expected to be. He did not purposely expose himself to excessive sound levels and indeed seems to have spent no more than a moment near the speaker. Maran did not, like some overenthusiastic rock-concertgoer, trespass or engage in risky behavior that brought him in proximity to the speaker. Defendants, not Maran, controlled the equipment, its setup, and its operation. Thus, the record does not suggest any negligence or culpability on Maran's part.

In short, in the context of an ordinary retail sales event, a loudspeaker does not ordinarily cause hearing loss without some negligence by those responsible for the equipment's placement and operation. Thus, as to Victoria's Secret and Silva, Maran is entitled to a *res ipsa*-based inference. I do not say, by the way, that plaintiff would necessarily prevail with the aid of *res ipsa loquitur* or that he could not prevail without it. But its availability demonstrates that summary judgment for Defendants would be inappropriate.

### 3. Causation and Damages

Defendants refer to Maran's "alleged" injuries, perhaps as a means of reserving their position as to causation and damages. That issue, however, remains one of fact.

Maran has, of course, testified that he was exposed to a loud blast of sound at the Victoria's Secret event. He has introduced the testimony of two medical experts: an otolaryngologist whom he initially consulted, and an audiological specialist to whom he was later referred. Dr. Fieldman, the otolaryngologist, opined that Maran's injury is "consistent with a [sound] blast." Dr. Bauman, the audiologist, opined that the incident at the store caused Maran's tinnitus and hyperacusis. While there may be some basis for cross-examination of those conclusions at trial, Defendants have offered no contradictory medical evidence. No party seems to dispute the medical evidence of hearing loss, and, in the context of Maran's factual testimony, it raises a triable issue as to causation and damages.

In sum, Defendants' motion for summary judgment on Count I (Negligence) is granted as to Scratch but denied as to Victoria's Secret and Silva.

## D. Principal and Agent Liability (Count III)

Count III alleges that Maran is entitled to recover damages from the principal on whose behalf an agent was acting.[8] Maran alleges that if "Victoria's Secret engaged Scratch Events, LLC, or any other John Doe entity as its agent to install and operate the sound system that caused injury to plaintiff, both the principal and agent are liable for the damages to plaintiff." (DE 44 ¶ 41).

### 1. Scratch and Silva as independent contractors

Under New Jersey law, to succeed in establishing a liability based on *respondeat superior*, a "plaintiff must prove (1) that a master-servant relationship existed and (2) that the tortious act of the servant occurred within the scope of that employment." *Carter v. Reynolds*, 175 N.J. 402, 409 (N.J. 2003).

To determine whether a master-servant relationship exists, New Jersey relies on the Restatement (Second) of Agency. *See Wright v. State*, 169 N.J. 422, 436 (2001). The Restatement provides a non-exhaustive list of factors with which courts evaluate whether a tortfeasor was the agent of another:

> (1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

> (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of facts, among others, are considered:

>> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;

---

[8]    A principal's liability for actions of an agent, although pled as a separate count, is not a cause of action *per se*. It is discussed herein as a theory of liability for negligence.

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220 (1958).

As to the issue of whether the injury occurred within the scope of the agent's employment, the New Jersey Supreme Court has likewise adopted the Restatement (Second) of Agency's framework. *Carter*, 175 N.J. at 411. The Restatement provides a four-part test:

Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228. Conversely, "[c]onduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.*

Under the test promulgated by the Restatement (Second) and adopted by the New Jersey Supreme Court, there is no doubt that Victoria's Secret did not "employ" Scratch or Silva.[9] There exists no master-servant relationship and accordingly, liability under *respondeat superior* will not attach.

Victoria's Secret is a purveyor of women's wear and beauty products. Its business is not the DJ business. Scratch and Silva, on the other hand, engage in the DJ business full-time. Scratch does not provide DJs exclusively for Victoria's Secret. Nor does Silva; in his fifteen-year DJ career, Silva has DJed for Victoria's Secret just three times. In the transaction that ultimately gave rise to the December 2014 event, Scratch acted as a promoter, procuring DJs for Victoria's Secret on a one-time basis. Silva chose to accept a one-time gig offered to him by Scratch. Victoria's Secret does not pay an ongoing salary or benefits to Scratch and Silva; it pays DJs by the appearance, which, in this case, took place for a few hours on one evening. The informal professional relationship and disparate business sectors indicate that Scratch and Silva acted in the capacity of an independent contractor.[10]

---

[9]   "Silva" here refers to both the corporate entity DJ Silva, LLC and Robert Silva in his personal capacity. I treat them together because Silva's formation of the LLC would not exculpate him from liability for a negligent tort that he personally committed, even in the course of the LLC's business. *See Kenney v. M2 Worldwide, LLC*, No. 12-1059, 2013 WL 3508564 (D.N.J. July 11, 2013) (citing *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 303 (2002) ("[T]he essence of the participation theory is that a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort.")).

[10]   Silva states that a Victoria's Secret manager told him where to place his sound equipment. This might be seen as a plaintiff-favorable fact in relation to the "control" element of the master-servant-relationship test. In the context of the other factors, however, this is insufficient to create an issue of fact as to *respondeat superior*. That a staff member told a for-hire individual where to place the tools of his trade does not convert that individual into an employee/servant. *See* Restatement (Second) of Agency

The evidence in the record demonstrates that neither Scratch nor Silva was a Victoria's Secret employee or servant, for whose acts Victoria's Secret would be liable under *respondeat superior*.[11]

### 2. Independent Contractor Exception

An issue remains as to whether Victoria's Secret could be vicariously liable for the acts of independent contractors Scratch and Silva

In general, "when a person engages an independent contractor to do work that is not itself a nuisance, he is not vicariously liable for the negligent acts of the contractor in the performance of the contract." *Puckrein v. ATI Transp., Inc.*, 186 N.J. 563, 574 (2006). To that general rule of non-liability, however, there are two relevant exceptions: (1) where the principal retains control of the manner and means of doing the work subject to the contract; and (2) where the principal engages an incompetent contractor. *See Majestic Realty Assocs. v. Toti Contracting Co.*, 30 N.J. 425, 431 (1959).[12]

Under the control exception, liability is imputed because where a principal exerts an atypical level of control over the means and manner by which an independent contractor performs a service, the principal becomes more than a mere supervisor and takes on responsibility for those acts. *See id.* at 431. Under control test, "the [principal's] reservation of control over the equipment to be used, the manner or method of doing the work, or direction of the employees of the independent contractor may permit vicarious liability." *Mavrikidis v. Petullo*, 153 N.J. 117, 135 (1998). Where there is control, the

---

§§ 220 & 228 (describing factors that determine master-servant relation and scope of employment).

[11]    It also appears, by the way, that Silva is an independent contractor in relation to Scratch. Their relationship is governed by a Talent Services Agreement which defines Silva as an independent contractor. Silva was hired by the job, did not get paid a salary or benefits, derived 60% of his income from non-Scratch events, paid his own expenses, hired and paid his own assistant as necessary, carried his own liability insurance, and owned his own equipment.

[12]    A third exception, where the activity constitutes a nuisance *per se*, is not invoked here. *Id.*

party who hired the contractor is liable for the contractor's negligence. This vicarious-liability doctrine is to be distinguished from the direct liability of Victoria's Secret for negligent placement of the speaker, *see supra*; under this exception, the person may be liable even if the control exercised and the way it is exercised are not causally related to the hazard that led to the injury. *Bergquist v. Penterman*, 46 N.J. Super. 74, 85 (App. Div. 1957).

For the reasons discussed in section II.D.1., *supra*, Victoria's Secret did not retain general control over independent contractors Scratch and Silva. Victoria's Secret sells women's wear and beauty products. On occasion its stores host events that call for the services of a DJ. When that requirement arose in December 2014 in Short Hills, the store contacted Scratch, which acted as a kind of promoter, and in turn secured the services of Silva. Throughout, each entity "stayed in its lane": Victoria's Secret hosted the event at its store; Scratch notified Silva of the particulars of the event; and Silva DJed the event. That a Victoria's Secret manager told the DJ where to place the speakers might, as noted above, contribute to a direct finding of fault-based liability; it is not sufficient, however, to constitute such unusual "control" over the equipment, manner, and method of the work that Victoria's Secret could be found vicariously liable, irrespective of fault or causation, for the negligence of Scratch or Silva.

The second exception, for hiring of an incompetent contractor, also does not apply. *See Puckrein*, 186 N.J. 563, 576 (2006) (citing *Mavrikidis*, 153 N.J. at 136–37) ("[T]o prevail against the principal for hiring an incompetent contractor, a plaintiff must show that the contractor was, in fact, incompetent or unskilled to perform the job for which he/she was hired, that the harm that resulted arose out of that incompetence, and that the principal knew or should have known of the incompetence."); *Mavrikidis*, 153 N.J. 117, 136 (1998) (alterations in original) (citations omitted) ("Under the second *Majestic* exception, a principal may be held liable for injury caused by its independent contractor where the principal hires an incompetent contractor. . . . [T]he

gravamen of th[is] exception is selection of a contractor who is incompetent. The selection of a competent contractor who negligently causes injury, does not render a [principal] liable. No presumption as to the negligence of an employer in hiring an independent contractor arises from the fact that, after being hired, the contractor is negligent in the performance of his duties and injures the person or property of another.").

The record contains no serious complaints or evidence of incompetence, whether on the part of Scratch or Silva. Maran relies here on just two negative reports in Silva's prior work history for Scratch: (1) On one occasion, Silva "was not there in enough time for them to give him a proper run of show so they did the first part on an ipod," and (2) at another time, Silva "[f]orgot power cord and then had additional technical difficulties during the wedding." (DE 91-4 at 29). These two prior incidents were minor, and would not permit a reasonable jury to find incompetence. They are insufficient to support the incompetent-contractor exception to the general rule of non-liability for the acts of an independent contractor.

Summary judgment is therefore granted for defendants on Count III (Principal-agent liability).

### E. Negligent Hiring (Count IV)

An employer may be liable to a third party whose injury was proximately caused by the employer's negligent hiring or retention of an employee who is unfit for the job. *See Di Cosala v. Kay*, 91 N.J. 159, 174 (1982). The cause of action for negligent hiring has two elements: (1) that the employer knew or had reason to know of the "particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons," and (2) that through the employer's negligence, the employee's "incompetence, unfitness, or dangerous characteristics proximately caused the injury." *Id.* at 516. To be foreseeable, the injury must be within a general "zone of risk" created by the employee's conduct. *Id.* at 517.

New Jersey courts recognize the tort of negligent hiring "where the employe[r] either knew or should have known that the employee was violent or aggressive, or that the employee might engage in injurious conduct toward third persons." *Davis v. Devereux Found.*, 209 N.J. 269, 292 (N.J. 2012) (quoting *Di Cosala*, 91 N.J. at 173). The tort of negligent hiring has two fundamental requirements:

> The first involves the knowledge of the employer and foreseeability of harm to third persons. An employer will only be held responsible for the torts of its employees beyond the scope of the employment where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons. The second required showing is that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury.

*Di Cosala*, 91 N.J. at 73 (internal citations omitted). Finally, "employee conduct which may form the basis of the cause of action need not be within the scope of employment. The wrong here redressed is negligence of the employer in the hiring or retention of employees whose qualities unreasonably expose the public to a risk of harm." *Id.* at 174.

Maran alleges that Victoria's Secret was negligent in hiring Scratch. It is less clear that he is alleging that Victoria's Secret somehow negligently hired Silva or DJ Silva, LLC.

Maran has not produced evidence to support a negligent-hiring contention. Scratch and Silva were not employees. There is no evidence that Scratch or Silva had any dangerous propensity of which Victoria's Secret should have known. *See* pages 22–23, *supra.* Accordingly, Defendants' motions for summary judgment dismissing Count IV are **GRANTED.**

## III.  CONCLUSION

To summarize, the motion for summary judgment of Scratch is **GRANTED** in its entirety; Count II (Premises Liability) is **DISMISSED** as against Silva in his personal capacity and DJ Silva, LLC; Count III (Principal

and Agent Liability) is **DISMISSED** as against all parties; and Count IV (Negligent Hiring) is **DISMISSED** as against all parties. The summary judgment motions are otherwise **DENIED**.

What remain are the following:

Count I (Negligence) as against Victoria's Secret, Silva in his personal capacity, and DJ Silva, LLC;

Count II (Premises Liability) as against Victoria's Secret.

A separate order will issue.

Dated: October 22, 2019

**Hon. Kevin McNulty**
**United States District Judge**